## 18228.  GRIFFIN v. THE STATE.

1. The crime of assault with intent to rape may be committed by two persons, the one committing the physical offense by unlawfully laying hands upon and otherwise undertaking to have sexual intercourse with the female forcibly and against her will, while the other may be acting jointly and with a common purpose.

2. A principal in the second degree is one who is actually or constructively present when the crime is committed.

3. In order to convict one as a principal in the second degree, he must not only be present when the crime is committed, but must aid and abet the actual perpetrator of the crime.

(a) One who is present when a crime is committed, but does not assist in its commission nor share in the criminal intent, can not be convicted as a principal in the second degree.

4. The evidence in this case on the question of joint enterprise upon the part of the two defendants who were jointly indicted for the offense of assault with intent to rape was circumstantial, and, though somewhat consistent with the guilt of the defendant as a principal in the second degree, was not inconsistent with every other rational hypothesis, and, being insufficient to show guilt beyond a reasonable doubt, the judgment overruling the motion for a new trial must be reversed. BROYLES, C. J., dissents.

DECIDED JULY 28, 1927.

Assault with intent to rape; from Jenkins superior court— Judge Strange.  May 5, 1927.

*James A. Dixon, Lewis & Lewis,* for plaintiff in error.

*John C. Hollingsworth, solicitor-general, William Woodrum, R. Lee Moore,* contra.

LUKE, J.  Hersey and Griffin were jointly indicted and separately tried for the offense of assault with intent to rape, alleged to have been committed on the person of Louise Johnston. The jury returned a verdict of guilty as to Griffin.  His bill of exceptions assigns error upon the refusal of his motion for a new trial.

The evidence submitted at the trial, so far as necessary for consideration here, was as follows:  Louise Johnston, the alleged injured female, testified substantially as follows:  I am twenty years of age, live in Millen, Georgia, and know Griffin and Hersey. I saw Griffin in January of this year.  He came to Millen and fixed a date for himself with Miss Stephens for Monday evening.

Criminal Law, 16 C. J. p. 125, n. 44; p. 126, n. 51; p. 128, n. 63; p. 130, n. 87.

Rape, 33 Cyc. p. 1437, n. 73; p. 1494, n. 76.

Miss Stephens, whose mother was in charge of the telephone exchange, and I worked together in the exchange. Miss Stephens arranged a date for me with Mr. Hersey, whom I had known for several years and in whose company I had been several times. I went over to the telephone exchange, which is the home of Miss Stephens, and at about 8 o'clock Hersey came to see me and Griffin came to see Miss Stephens. We talked for a few minutes and they suggested that we go to the picture show. I agreed to go on consideration that we not stay long, and we all came down, and, inasmuch as it was not far, we wished to walk to the show, but they suggested that we ride. We got in the car. Mr. Griffin, Miss Stephens, and myself sat on the seat of the car, and Hersey sat on the car door. Griffin drove the car on down the street, and I said, "This is not the way to the picture show," and he said, "Let's go by Mary Taylor's house." I said that the clock had struck eight and that the show started at eight, and when we went by Mary Taylor's house no one was there, and when he went on and did not stop, I began to protest and tried to scream, and Mr. Hersey, who was sitting on the door next to me, put his hand over my mouth and said, "Sit down and don't cut up so; don't be silly, we are just going to ride a little piece and come back to the picture show." Griffin drove on out about two miles and said, "We will turn around here," and he drove up to a church, stopped the car, and turned the lights out; and I said, "Turn on the lights," and he turned on the dimmers; and I said, "I am going home, and I am going to walk home," and Mr. Hersey said, "I don't know how you are going to walk, because I am not going to let you." Mr. Hersey told me to come around out of the car with him, and I told him I would die before I would, and he caught me by my right arm and right leg and pulled me out of the car, and at about twenty feet from the car he tripped me up and threw me on the ground. Mr. Hersey was drinking, for I smelled it on his breath, but I don't know whether Mr. Griffin was drinking or not. I first discovered Hersey was drinking when, while riding, his face got close to mine and I smelled the whisky on his breath. While we were driving I did not continue to make an outcry, but kept on begging to let's go back; and Mr. Hersey said we would turn around at the very next place. Mr. Griffin did not say anything at that time. I guess we went about two

miles, and no one said "Let's turn," but Griffin turned out to the church and stopped the car. When he stopped the car and turned the lights out, I told him to turn the lights on, and he (Griffin) said, "Oh, all right, I will turn the dimmers on." Mr. Hersey then began arguing with me about getting out of the car. When I would not get out, Mr. Hersey pulled me out. I was crying and begging him to let me alone, when he got around the corner of the church and tripped me and threw me down on the ground. He held my left leg down with one of his knees and held his hand over my mouth, and held my head down so hard that he rubbed it in the dirt. He told me that if I kept fighting he would kill me. He pulled up my clothes and tried to do what he went there to do, I guess. I kept fighting, and every time his hand would slip off of my mouth I would scream, and every time I would scream he would talk about killing me. Finally my underclothing saved me. The position we were in was that I was flat on the ground and Mr. Hersey was across on top. While I was pleading with Mr. Hersey to let me get up and go, I called Mr. Griffin and he came; and Mr. Hersey said to him, "If you come a step further I will kill you," and Mr. Griffin turned and went back to the car. When I got loose from Mr. Hersey I ran to the car where Mr. Griffin and Miss Stephens were, and I wanted Mr. Griffin to carry me back to town before Mr. Hersey could get there, but he didn't. Mr. Hersey came on to the car, and I told him I was going to tell my brother about it and he would kill him, and Mr. Hersey said he could shoot as straight as anybody, and he took his pistol and put it in his right hip-pocket, and he took a jar from somewhere in the back of. the automobile and took two or three drinks of whisky and offered Mr. Griffin some, but he would not take it. We went on back to town, and on the way in Mr. Griffin said nothing. I was crying, and Hersey was saying that if I did not hush he would not take me back, but would kill me. Mr. Griffin was driving, Miss Stephens was sitting next to him, I was sitting next to her, and Mr. Hersey stood on the running-board. When we got to Miss Stephens' I said, "I am going home," and Mr. Hersey said, "If you do, I am going to kill you. Go on up stairs, for I have something in my pocket to make you go." Mr. Griffin did not say anything. We went on up stairs where Mrs. Stephens and a child were, and Mr. Griffin, Miss

Stephens, and I sat down for a few minutes; and Mr. Hersey started playing marbles on the floor with Mrs. Stephens' little daughter. When I saw my chance to get away I went home, and when I got there I told my sister about it. There were injuries on my body—scratches on my left arm and bruises on my left leg between my knee and hip. I have known Mr. Hersey about four years, I have been in his company several times. All this happened in January, 1927, in Jenkins county, Georgia.

Lois Stephens, for the State, testified substantially as follows: I am eighteen years old, and Miss Johnston and myself worked at the telephone exchange, where my mother is in charge, and we live in the telephone-exchange building. Mr. Griffin came to town and called me up and made a date with me, and wanted to know if he could bring Mr. Hersey with him, and I asked Louise Johnston if she would give Hersey a date, and she said she would, and would go to the show. Mr. Griffin and Mr. Hersey came to the exchange at about 7:30 in the evening, and Miss Johnston soon came. We stayed there in the room together for about ten minutes, and when we started off they asked us to go to the picture show with them. We consented, and when we got down on the street, they suggested that we ride. Mr. Griffin suggested riding, and Mr. Hersey said he would do anything the crowd did. We said there was no use to ride, as the show was only half a block away. Then they said they did not want to leave the car, as in the back seat there were suit-cases and tires. Mr. Griffin got on the front seat of the car and I got next to him, and Miss Johnston next to me, and Mr. Hersey sat on the door of the car. The car was headed away from the show, and we drove on around the block, and Mr. Griffin said we would go by May Taylor's house, and when we saw no one he drove on out. All the time we kept begging them to turn round, but he turned on another road. Miss Johnston was crying and begging them to turn around. Mr. Griffin turned in and stopped the car in front of a church, and turned off the lights. Miss Johnston asked him what he meant by turning the lights off, and he said he would put the dimmers on. Miss Johnston began screaming. Mr. Hersey came around to where she was and asked her to get out, and she said she wasn't going to do it. Mr. Hersey then dragged her out. She was trying to fight him back. He was ·tussling with her at the side of the car, and he finally suc-

ceeded in getting her back of the car and back of the church. When she got back of the church she was screaming and calling me, and the reason I did not go, Mr. Griffin was holding my hands; and when he did not turn me aloose, I asked him, if his sister was being done like that, would he sit there and see all that going on and not help. He then said he would go, and he went, but not clean to where they were; and Mr. Hersey said something to him, but I could not hear what it was; and he came back, and in a few minutes Miss Johnston came to the car and got in it beside me and was crying. I asked her what was the matter, and she said that it was the most outrageous thing that had ever happened to her. Mr. Hersey came and took a jar out of the back of the car and took a big drink, and asked Mr. Griffin to have some, but he didn't take it. Hersey put his pistol in his pocket, and we kept telling him to get in the car. He finally got in, and we came on to my house, where we stayed about ten minutes. Mr. Griffin was not drinking, nor. did I smell any whisky on his breath. I had known him for some time, and he had never said or done anything objectionable on. any of his visits to me.—The State offered other evidence, locating distance, place, etc.

The defendant Griffin made substantially the following statement: I live in Waynesboro, Ga., and have lived there for ten years. In January I heard about the good jobs down in Florida and went down there, but could not do as well as I expected. I came back, and on the way home in January I passed through Millen, and not having seen any one that I knew for a month, and having known Miss Stephens, and having called on her before, I phoned her and asked for a date. She gave me the date. Knowing that Hersey knew Louise Johnston, it was suggested that she get a date with her for him, and she did, and said for us to come around about 8 o'clock. When we got to Miss Stephens' home Miss Johnston was not there, but came soon. We talked about going to the picture and going for a ride. I had been to ride with Miss Stephens before, and I did not see any harm in our going. We rode by May Taylor's house, but I saw no one there and did not stop. I drove on out the road a mile or two, and Miss Johnston objected to Hersey putting his hand on her shoulder. As I came to the church, Hersey, or Miss Johnston, said stop.

and Hersey asked Miss Johnston to get out, and she objected, and he kind of pulled her out, and they went on around the church about sixty or seventy feet from the car where Miss Stephens and I were sitting. I heard them arguing, but did not know that anything improper was taking place. I just thought she was mad with Hersey, and Miss Stephens said that I had better call him to come and go. I said, "Wait a minute, and they will come," and she said, "If you don't go, I will go myself," and she made a move to go herself, so I took her by the hands and put her in the seat. I did not mean any offense. Then I went myself. I did not see why she should go. I walked behind the car and called Hersey and told him to come on and behave himself. I came on to the car, and in a minute or so Miss Johnston came to the car, and she was mad and crying, and when Hersey came to get on the side of the car, Miss Johnston said, "I am going to tell my brother on you." He said, "Tell anybody you want to." He said to her in a kind of a joking way that he could shoot as straight as anybody. We went on back to Miss Stephens' home, and, after staying there for a while, Miss Johnston went to her home, and I remained with Miss Stephens for a while. Soon some one came to the door, and said my friend was out there and drinking, and that I had better get him out of town. I did not see all that happened at the church. I went and got Hersey, and he seemed to have had more to drink. I did not know that Hersey had outraged Miss Johnston until I was arrested at Waynesboro. I know that I did not do anything wrong, and I did not know that Hersey was doing what he did. I did not frame up to take these girls out and have Hersey do what he did. I have known Miss Stephens for years, and I have always conducted myself right with her. I know that Hersey did not do right, but I had nothing to do with it.

The defendant's good character was testified to by seven men of unquestioned character and integrity from his home town.

Does the evidence justify the conviction of Griffin? We think not. It is contended that the fact that Griffin drove the car and continued to drive over Miss Johnston's protest, and then stopped where he did and sat there while Hersey was pulling or dragging Miss Johnston, over her protest, to the rear of the car, was sufficient to justify the conclusion that Griffin was engaged in a joint enter-

prise with Hersey to have sexual intercourse with Miss Johnston forcibly and against her will. We can not escape that feeling of resentment and indignation engendered by the detailing of the facts touching the conduct of Hersey. It is very easy, with the public mind excited, as it must have been, for that calm and judicial temperament which should guide the jury to give way to the slightest circumstance from which guilt might be suggested. It is settled that to constitute one a principal in the second degree, he must not only be present when the crime is committed, but must aid and abet the actual perpetrator of the crime. One who is present when a crime is committed, but neither assists in its commission nor shares in the criminal intent of its perpetrator, can not be convicted as a principal in the second degree. Under no view of the evidence can we say that beyond a reasonable doubt Griffin conspired with, acted jointly with, abetted, or shared in the criminal intent of the actual perpetrator of the offense. Griffin was lacking in discretion and chivalry, but every reasonable hypothesis save that of his guilt in this case is not excluded. For the reason that the evidence did not authorize the verdict of guilty as to Griffin, it was error for the court to overrule his motion for a new trial. *Judgment reversed. Bloodworth, J., concurs.*

BROYLES, C. J., dissenting. Under all the facts of the case as disclosed by the record, I think the jury were authorized to find that Griffin and Hersey had entered into a conspiracy for the raping of the female by Hersey, and that Griffin was present at the scene of the crime, aiding and abetting Hersey in the latter's assault with intent to rape. In my opinion Griffin was guilty as principal in the second degree. See *Howell* v. *State,* 160 *Ga.* 899 (129 S. E. 436).